UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. KARA M. WESTERCAMP

| | |
|---|---|
| Longquan Jiefeng Trade Co., Ltd., Zhejiang Senya Board Industry Co., Ltd and Zhangzhou Wanjiamei Industry & Trade Co., Ltd.<br><br>Plaintiff,<br>v.<br>United States,<br>Defendant. | Court No. 26-002485 |

# MEMORANDUM OF LAW IN SUPPORT OF THE RULE 56.2 MOTION OF PLAINTIFFS LONGQUAN JIEFENG TRADE CO., LTD., ZHEJIANG SENYA BOARD INDUSTRY CO., LTD AND ZHANGZHOU WANJIAMEI INDUSTRY & TRADE CO., LTD. FOR JUDGMENT UPON THE AGENCY RECORD

David J. Craven, Esq.
CRAVEN TRADE LAW LLC
3744 N Ashland Avenue
Chicago, Illinois 60613
Tel. 773-709-8506
David.craven@tradelaw.com
Counsel for Plaintiffs Longquan Jiefeng Trade Co., Ltd., Zhejiang Senya Board Industry Co., Ltd and Zhangzhou Wanjiamei Industry & Trade Co., Ltd

Dated: October 13, 2026

# TABLE OF CONTENTS

Table of Contents .......... i
Table of Authorities .......... ii
I. Introduction .......... 1
II. Statement Pursuant to Rule 56.2(C) .......... 2
A. Administrative Determination Under Review .......... 2
III. Issues of Law .......... 2
IV. Summary of Arguments .......... 4
V. Statement of Facts .......... 5
VI. Standard of Review .......... 5
VII. Argument .......... 7
A. The Department's Use of a More Advanced Product as a Surrogate for a Raw Material Results in an Aberrational Value .......... 7
B. The Department Erred in Calculating the Financial Ratios .......... 9
a. The Department Should Have Used at Least Two Financial Statements in Calculating the Financial Ratios .......... 9
b. The Finesse Financial Statement is Flawed and Not Usable .......... 10
c. The Other Financial Statements of Record are Usable .......... 11
C. The Department Should not Take Adverse Inferences Against Senya .......... 12
V. Conclusion .......... 19

## Table of Authorities

Statutes and Regulations:

19 U.S.C. §1516a(a)(2)(A)(i)(I) .......... 4

19 U.S.C. §1516a(a)(2)(B)(iii) .......... 4

19 U.S.C. §1516a(b) .......... 5

19 U.S.C. §1673d(c)(5) .......... 5

28 U.S.C. §1581(c) .......... 4

Court:

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) .......... 8

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 95 S. Ct. 438, 42 L. Ed. 2d 447 (1974) .......... 9

*Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012) .......... 9

*Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197 (1938) .......... 8

*Diversified Products Corp. v. United States*, 6 CIT 155, (1983) .......... 8

*Dorbest Limited et. al. v. United States*, 604 F.3d 2010 (Fed. Cir. 2010) .......... 11

*F.lli de Cecco di Filippo Fara S. Martino S.P.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000) .......... 10

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997) .......... 6

*Loper Bright Enterprises v. Raimondo, 603 U.S. 369 (2024)* .......... *8*

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) .......... 6

*Mannesmannrohen-Werke AG v. United States,* 23 CIT 826, 77 F.Supp.2d 1302 (1999) .......... 12

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003)14-15,17 and 19

*Novosteel SA v. United States,* 284 F. 3d 1261 (Fed. Cir. 2002) .......... 9

*Shakeproof Assembly Components, Division Of Illinois Tool Works, Inc., v. United States, Defendant-Appellee,* 268 F.3d 1376 (Fed. Cir. 2001) .......... *10*

*Shanghai Tainai Bearing Co., Ltd. v. United States,* 658 F.Supp.3d 1269 (Ct. Int'l Trade 2023 .......... 21

*Shanghai Taoen Int'l Trading Co., Ltd. v. United States*, 360 F.Supp.2d 1339 (Ct. Int'l Trade 2005) ....................12

*SKF USA, Inc. v. United States.* 254 F.3d 1022, 1028 (Fed. Cir. 2001) ....................7

*Tung Mung Dev. Co., v. United States*, 354 F.3d 1371(Fed. Cir. 2004) ....................7

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ....................6

*USX Corp. v. United States*, 11 CIT 82, 655 F. Supp. 487 (1987) ....................6

*Venus Wire Industries Pvt. Ltd. v United States*, 417 F.Supp.3d 1289 (Ct. Int'l Trade 2020) ....................17

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. KARA M. WESTERCAMP

| | |
|---|---|
| Longquan Jiefeng Trade Co., Ltd., Zhejiang Senya Board Industry Co., Ltd and Zhangzhou Wanjiamei Industry & Trade Co., Ltd.<br><br>Plaintiff,<br><br>v.<br><br>United States,<br><br>Defendant. | Court No. 26-002485 |

## I. INTRODUCTION

This is an appeal from the final results of the Antidumping Duty Administrative Review in *Wood Moulding and Millwork Products from the PRC: Final Results of Antidumping Duty Administrative Review,* 91 Fed. Reg. 8823 (February 24, 2026) ("Final Determination") and the accompanying Issues and Decision Memorandum (February 20, 2026) ("IDM"). Plaintiffs Longquan Jiefeng Trade Co., Ltd., Zhejiang Senya Board Industry Co., Ltd and Zhangzhou Wanjiamei Industry & Trade Co., Ltd. are Corporations organized under the laws of the People's Republic of China. Plaintiffs produced and/or exported Wood Moulding in the People's Republic of China and exported the same to the United States. All plaintiffs were active participants in the Department of Commerce antidumping administrative review and plaintiffs Longquan Jiefeng Trade Co., Ltd. and Zhejiang Senya Board Industry Co., Ltd were designated as mandatory respondents.

Plaintiffs assert the following errors in the Commerce Department's ("Commerce" or "Department") final determination:

- The Department's final determination to use veneer for a substitute for logs without adjustment is not appropriate.
- The Department's selection of a single financial statement as the basis for financial ratios was incorrect. The Department had of record multiple financial statements, but instead of selecting a single financial statement, the Department elected to rely upon a non-representative financial statement.
- The Department erred when it found that Senya had failed to cooperate and thus rejected the data involving the processing of logs. Senya provided all of the information in its possession and which it could reasonably obtain. The information of record was sufficient to calculate values for the processing of the logs.

## II. STATEMENT PURSUANT TO RULE 56.2(c)

### A. Administrative Determination Under Review

This action is brought pursuant to the authority of 19 U.S.C. §1516a(a)(2)(A)(i)(I), 19 U.S.C. §1516a(a)(2)(B)(iii), and 28 U.S.C. §1581(c) to contest the final results of the U.S. Department of Commerce's ("Commerce" or "Department") administrative review of *Wood Mouldings and Millwork Products From the People's Republic of China*, published as *Wood Mouldings and Millwork Products From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2023–2024,* 91 Fed. Reg. 8823 (February 24, 2026) (P.R. 17) and the underlying final administrative determination and the accompanying Issues and Decision Memorandum. (I and D Memo)(P.R. 18).

In the Final Results, Commerce calculated a rate of 61.86% for plaintiffs Longquan Jiefeng Trade Co., Ltd. and Zhejiang Senya Board Industry Co., Ltd and a rate of 37.24% for plaintiff Zhangzhou Wanjiamei Industry & Trade Co., Ltd.. (P.R. 17)

## III. Issues of Law

The Plaintiffs present the following issues. As detailed herein, Commerce's determination was not based on substantial evidence on the record, and was arbitrary

and capricious, an abuse of discretion, and not otherwise in accordance with law. The issues are:

- **Whether the use of veneer as a substitute for logs without adjustment resulted in an aberrational value and was against the weight of the evidence.**

In valuing the surrogate factors of production, the Department used the value for veneer, a finished product, as a substitute for logs, a raw material. Such decision established highly inflated surrogate values, which in turn, resulted in an aberrational margin and was other highly distorted. Such decision was against the weight of the evidence which establishes that logs and veneer are very different materials with very different values.

- **Whether the Department should have selected more than a single financial statement. The Department had of record multiple representative financial statements, but elected to reply upon a non-representative financial statement.**

In calculating surrogate financial ratios, the Department only used a single non-representative financial statement. The Department had of record multiple financial statements for appropriate producers of comparable merchandise. Notwithstanding the Department's stated preference for using more than one financial statement in calculating ratios, the Department did not use these alternate financial statements, but rather elected to rely on a single non-comparable financial statement.

- **The Department erred when it found that one of the mandatory respondents had failed to cooperate and refused to use the log processing data provided by the mandatory respondents.**

In calculating the rates, the Department found that Senya Board had failed to cooperate when if did not provide information not in its possession and refused to use the log processing data provided. The Department determined to use adverse facts in lieu of the facts of record. The Department should have used the data of record and not used "alternate facts".

## IV. Summary Of Arguments

The Department committed multiple errors which artificially increased the margin. Each of these errors are significant and the matter should be remanded to the Department to correct such errors.

- The Department's use of veneer as a surrogate for logs was not appropriate. The Department has a long established goal of accuracy. The use of surrogate value based on advanced intermediary material rather than a raw material resulted in an overstatement of the values and thus the calculation resulted in an inaccurate and aberrational margin.
- The Department had of record multiple usable financial statements as a basis for surrogate financial ratios. Notwithstanding the Department's long standing preference to use multiple financial statements, the Department used a single financial statement in the calculation Compounding this problem, the selected financial statement was not appropriate and one or more of the alternate financial statements were superior.
- The Department found that Senya had not cooperated when it failed to supply certain information from unrelated third parties. Senya provided all of the information in its possession, such information was sufficient to form the basis for the financial ratios, and to the extent that certain information was not provided, such information was not needed in the calculation. The taking of adverse inferences was not appropriate in light of the full cooperation of Senya.

## V. Statement Of Facts

The antidumping duty administrative review of Wood Mouldings and Millwork Products From the People's Republic of China for the 2023/24 period was initiated on April 9, 2024. See *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 89 Fed, Reg. 24,780 (April 9, 2024)) (P.R. 307*).* On June 16, 2025, Commerce published its preliminary results as *Wood Mouldings and Millwork Products From the People's Republic of China: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2023–2024,* 90 Fed. Reg. 25209 (June 16, 2025) *(P.R. 81)* accompanied by Commerce's *Issues and Decisions.* (P.R. 82). Plaintiffs Senya and Jiefeng were assigned a rate of 26.25% and plaintiff Wangjiamei was assigned a rate of 12.24%. (P.R. 81) .

Commerce issued its final results on February 24, 2026 and these results were published in the Federal Register as *Wood Mouldings and Millwork Products From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2023–2024,* 91 Fed. Reg. 8823 (February 24, 2026).(P.R. 17). In the final results the Department assigned a rate of 61.86% to plaintiffs Longquan Jiefeng Trade Co., Ltd. and Zhejiang Senya Board Industry Co., Ltd and a rate of 37.24% for plaintiff Zhangzhou Wanjiamei Industry & Trade Co., Ltd

## VI. STANDARD OF REVIEW

The Court will hold unlawful Commerce determinations that are unsupported by substantial evidence on the record or are not otherwise in accordance with law. 19 U.S.C. §1516a(b). To determine whether Commerce's interpretation and application of 19 U.S.C. §1673d(c)(5) is "in accordance with law," the courts review the statute to determine whether Congress has directly spoken to the precise question at issue.

If the statute is silent or ambiguous with respect to the specific issue, the Supreme Court has held that it is responsibility of the Federal Courts to determine

the meaning of the law. *Loper Bright Enterprises v. Raimondo, 603 U.S. 369 (2024). Loper* stated in relevant part "*Chevron* is overruled. Courts must exercise their dependent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright* 144 S.Ct. 2244 at 2273.

Furthermore, once the statute has been properly interpreted by the Court, the question is then whether the decision is supported by substantial evidence. Substantial evidence is well defined by Court precedent. Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951), *quoting Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938). Furthermore, "substantial evidence" must be measured by the record as a whole, "including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (quotations omitted). Thus, "it is appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to {that} view.'" *Diversified Products Corp. v. United States*, 6 CIT 155, 161 (1983) *quoting Universal Camera*, 340 U.S. at 488.

Moreover, Commerce's determination cannot be based on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *USX Corp. v. United States*, 11 CIT 82, 84, 655 F. Supp. 487, 489 (1987). The substantial evidence standard requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (citation omitted).

Moreover, when substantial evidence is not utilized, such action is tantamount to the use of speculation in making a determination. *See Lucent Techs., Inc. v.*

*Gateway, Inc.,* 580 F.3d 1301, 1327 (Fed. Cir. 2009) ("It is well established that speculation does not constitute 'substantial evidence.'" (quoting *Novosteel SA v. United States,* 284 F. 3d 1261, 1276 (Fed. Cir. 2002) (internal quotation marks omitted)).

It is axiomatic that Commerce may not exert its authority in an arbitrary or capricious manner. *See, e.g., Tung Mung Dev. Co., v. United States*, 354 F.3d 1371, 1378 (Fed. Cir. 2004). Commerce's decision will be set aside if it is arbitrary and capricious. *See, e.g., SKF USA, Inc. v. United States.* 254 F.3d 1022, 1028 (Fed. Cir. 2001). "{A} reviewing court must apply both standards {substantial evidence, and arbitrary and capricious or contrary to law}, while "an agency's finding may be supported by substantial evidence," yet "nonetheless reflect arbitrary and capricious action." *Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284, 95 S. Ct. 438, 42 L. Ed. 2d 447 (1974).

## VII. ARGUMENT

### A. The Department's Use of a More Advanced Product as a Surrogate for a Raw Material Results in an Aberrational Value

In valuing the surrogate factors of production in the final results, the Department used the value for veneer, a finished material, as a substitute for logs, a raw material. *Final Surrogate Value Memo* (P.R. 13) The Department made this determination based on partial adverse facts. As discussed below, the use of adverse facts was not appropriate, but even if it were appropriate, it does not justify the use of a finished material (veneer) as a surrogate for a raw material without adjustment. Such decision was against the weight of the evidence which establishes that logs and veneer are very different materials with very different values. In selecting surrogate values, even based on adverse facts, the Department is charged with the goal of selecting

accurate surrogate values. see *F.lli de Cecco di Filippo Fara S. Martino S.P.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000) in which the Court stated:

> It is clear from Congress's imposition of the corroboration requirement in 19 U.S.C. § 1677e(c) that it intended for an adverse facts available rate to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance. Congress could not have intended for Commerce's discretion to include the ability to select unreasonably high rates with no relationship to the respondent's actual dumping margin.
> *De Cecco* at 1032.

As observed by the Court in *Shakeproof Assembly Components, Division Of Illinois Tool Works, Inc., v. United States, Defendant-Appellee,* 268 F.3d 1376 (Fed. Cir. 2001):

> In determining the valuation of the factors of production, the critical question is whether the methodology used by Commerce is based on the best available information and **establishes antidumping margins as accurately as possible.** *Shakeproof* at 1382. (Emphasis Added)

Accuracy is a very important goal. The record is clear that Senya Board purchased Wood logs, not veneer and, while retaining ownership of the logs, had the toller convert the logs into veneer, the actual raw materials used in the production of the wood moulding. (See Senya's Response to Section D at 30-36) (C.R.161) In other words, the veneer is an intermediate finished product between the log and the wood moulding. Senya Board reported the wood log's consumption and reconciled the wood logs consumption to the financial statement. The toller provided other data including electricity and labor. Any other data would be reflected in the surrogate financial ratios and similar information applied to the surrogate values in calculating NV. Using an SV for wood veneer results in significant double counting including effectively applying the surrogate financial ratios in calculating the value of the veneer (as the value of the veneer including all of the processing cost, profit and the like) and then applying these values a second time in calculating normal value. It is very clear,

based on the surrogate values, that logs and veneer are very different articles of commerce with very different values and uses. Furthermore, logs and veneer can have very different final uses and logs are not "committed" to the production of veneer.

Simply put, the use of veneer as a substitute for raw wood without significant adjustment is simply not appropriate. The use of a "finished" material as a surrogate for a raw material without adjustment is clearly distortive on its face and is not accurate. By doing so, the value of the inputs to convert the raw material into the intermediate product are double counted.

**B. The Department Erred in Calculating the Financial Ratios**

In the final results, the Department used a single financial ratio – that of Finesse Moulding Sdn. Bhd as the surrogate financial ratio. (Final SV Memo)(P.R. 13). In doing so, the Department made two errors, each of which should be corrected and each of which resulted in improper increase in the ratio and the margins.

a. The Department Should Have Used at Least Two Financial Statements in Calculating the Financial Ratios

The Department has an established practice of using at least two financial statements in calculating surrogate financial ratios. This policy has been confirmed by the Courts. In *Dorbest Limited et. al. v. United States*, 604 F.3d 2010 (Fed. Cir. 2010) the Court stated:

> Generally, if more than one producer's financial statements are available, Commerce averages the financial ratios derived from all the available financial statements... But Commerce explained that its preference is "to use multiple financial statements in order to eliminate potential distortions that may arise from using those of a single producer," as long as those financial statements "are not distortive or otherwise unreliable. *Dorbest* at 1368, 1374.

In this case, the Department used only a single financial statement notwithstanding multiple financial statements being of record in this matter, and as discussed below, such additional financial statements were not distortive or otherwise unreliable.

The Finesse financial statement is flawed. The Department should not use a flawed financial statement where other financial statements are available. At a bare minimum, this statement should have been averaged with at least one of the other financial statements of record. Each of these other financial statements are usable, are not more flawed, and at a minimum, should have been averaged with the Finesse financial statement. By doing so, the Department will fulfill the goal of accuracy by basing the financial ratios on more than a single entity. This is the goal of the Department with its policy of using multiple financial statements.

b. The Finesse Financial Statement is Flawed and Not Usable

The Department should not use the Finesee Moulding (M) Sdn. Bhd Financial statement as a basis, let alone the sole basis, for financial ratios. This statement is flawed because of the very limited nature of the non-comparable articles produced by Finesee. As noted on the last page of the financial statement:

> The Company is principally engaged in the manufacturing and selling of high quality and design-driven picture frames moulding.
>
> Financial Statement, P.R.103 at 197

Critically, the financial statement shows that their raw material is "sawn timber" and does not record the use of other materials such as MDF used in the production of subject merchandise. (P.R. 102 at 25 and C.R. 152.) In contrast, Senya produces a broad ranges of moulding products used as structural molding and of varying lengths and dimensions. See Exhibit D-6 to Senya's Section D response. (C.R.161 at 44 - 47) and uses multiple materials including wood logs, Medium Density Fiberboard ("MDF") and melamine. In contrast, picture frame mouldings are of far smaller lengths and dimensions. These are not used as a structural product and are built to different demands. Where, as here, the Department has other financial statements that more closely approximate the products being produced, uses more of the materials used in the factors of production, and relates to multiple subject products, a

financial statement that relates solely to a single article which is not the product being produced and is made of only some of the materials used in the subject merchandise should not be given any preference.

c. The Other Financial Statements of Record are Usable

The other financial statements of record are usable and should be used by the Department in calculating financial ratios.

1. Gold Apolo

Gold Apolo produces a wide-range of furniture products including flat pack furniture incorporating chip-board and other products using MDF. (See Senya's Final Submission of Surrogate Values at Exhibit 7(b)(ii)) (PR 97 at 138) This product is similar to MDF moulding as it requires the manipulation of manufactured wood, as opposed to hardwood. As wood moulding includes the production of articles from manufactured wood, a producer of articles using manufactured wood should be part of the ratios.

2. Fine Quality Timber Sdn Bhd (P.R.103 at 65)

Fine Quality Timber Sdn Bhd ("Fine Quality is involved in the timber grading and dealing business with respect to timber and rubber wood. As detailed in the financial reports, such operations necessarily include significant production operations. The company has substantial property, plant and equipment. (P.R. 103 at 76) In particular it reports machinery and equipment with a value of 4,691,541 RM our of total assets of 17,551,284 RM (P.R. 103 at 88). Critically, as noted in the financial statement, Fine Quality is involved in remanufacturing, finger jointing and reengineering of millwork. (P.R. 103 at 102). See also the list of services provided by Fine Quality. (P.R. 103 at 104-105). In sum Fine Quality produces millwork and undertakes key operations, such as finger jointing. Such operations are critical for the production of subject merchandise.

Simply put, the selected financial statement does not fully reflect the operations undertaken by Senya, including the absence of working on certain materials. Furthermore, one of the other producers, for example, produces millwork and undertakes key operations such as finger jointing which are closely tied to the production of subject merchandise. The Department's selection of surrogate financial ratios is thus fatally flawed.

### C. The Department Should not Take Adverse Inferences Against Senya

In the final results the Department applied partial AFA based on the non-cooperation of Senya's toller. (I and D Memo at Comment 10)(P.R. 18). There is no evidence of record that Senya did not fully and completely cooperate with the Department during this review. Quite to the contrary, Senya provided all of the information in its possession and obtained as much information as it could obtain from its unrelated toller, and critically provided all of the information needed for purposes of the surrogate values. The Department must take this cooperation into account when calculating the final rate for Senya.

The Courts have stated:

> The statute does not provide an express definition of "the best of its ability," although the Federal Circuit has determined that "the statutory mandate that a respondent act to `the best of its ability' requires the respondent to do the maximum it is able to do." *Nippon Steel Corp. v. United States,* 337 F.3d 1373, 1382 (Fed.Cir.2003). To meet this standard, Commerce "needs to articulate why it concluded that a party failed to act to the best of its ability, and explain why the absence of this information is of significance...." *Mannesmannrohen-Werke AG v. United States,* 23 CIT 826, 839, 77 F.Supp.2d 1302, 1313-14 (1999). *Shanghai Taoen Int'l Trading Co., Ltd. v. United States*, 360 F.Supp.2d 1339 (Ct. Int'l Trade 2005) at 1344.

It is axiomatic that the Department should not apply partial adverse facts to a fully cooperative entity. This does not mean that the Department cannot fill in

gaps of missing information. To the extent that necessary information is not available, the missing information should be selected from neutral facts, not adverse facts. It does mean that the Department should fill in any gaps with values that do not result in punitive determinations.

In order for an entity to be found not to be cooperative, it requires more than a showing of an error or a mistake. *Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003), clearly outlines the requirements. In *Nippon Steel* the plaintiff had failed to provide certain conversion data in its possession in a timely manner. The issue was whether such failure justified the application of adverse inferences. The court found that there were two circumstances where information might not be complete. The Court of Appeals for the Federal Circuit stated:

> The statute has two distinct parts respectively addressing two distinct circumstances under which Commerce has received less than the full and complete facts needed to make a determination. Under subsection (a), if a respondent "fails to provide [requested] information by the deadlines for submission," Commerce shall fill in the gaps with "facts otherwise available." The focus of subsection (a) is respondent's failure to provide information. The reason for the failure is of no moment. The mere failure of a respondent to furnish requested information — for any reason — requires Commerce to resort to other sources of information to complete the factual record on which it makes its determination. As a separate matter, subsection (b) permits Commerce to "use an inference that is adverse to the interests of {a respondent} in selecting from among the facts otherwise available," only if Commerce makes the separate determination that the respondent "has failed to cooperate by not acting to the best of its ability to comply." The focus of subsection (b) is respondent's failure to cooperate to the best of its ability, not its failure to provide requested information.

The legislative history found in the Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act, Pub.L. No. 103-465, 108 Stat. 4809 (1994) ("URAA"), confirms the distinction between the two sections. . . . In adopting the URAA, Congress changed the terminology and noted:

> New section {1677e(a)} requires Commerce and the Commission to make determinations on the basis of facts available where the requested information is missing from the record or cannot be used because, for example, it has not been provided, it was provided late, or Commerce could not verify the information.
>
> * * *
>
> {N}ew section {1677e(b)} permits Commerce and the Commission to draw an adverse inference where a party has not cooperated in a proceeding. A party is uncooperative if it has not acted to the best of its ability to comply with requests for necessary information. Where a party has not cooperated, Commerce and the Commission may employ adverse inferences about the information to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully.

SAA at 869-70, reprinted in 1994 U.S.C.C.A.N. 4040, 4198-99. * * * Before making an adverse inference, Commerce must examine respondent's actions and assess the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information. Compliance with the "best of its ability" standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation. While the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping. It assumes that importers are familiar with the rules and regulations that apply to the import activities undertaken and requires that importers, to avoid a risk of an adverse inference determination in responding to Commerce's inquiries: (a) take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called upon to produce; (b) have familiarity with all of the records it maintains in its possession,

> custody, or control; and (c) conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of the importers' ability to do so.
> *Nippon Steel* at 1380 – 1383.

In the case of *Nippon Steel*, the plaintiff was ultimately found to have the records in its possession, and thus, as the plaintiff had control of the records and thus the failure to provide them was a failure to use best efforts. However, the test enumerated clear states that if a party does not have or maintain a particular record, they cannot be found to have failed to use best efforts for failing to provide such record.

This is particularly important with respect to the calculation of the surrogate values for the wood inputs. Specifically, any claim that Senya was uncooperative because it was unable to provide the necessary information is without merit. The requested data in its possession and as Senya made substantial efforts to obtain information from this unrelated party, it should not be subject to the application of adverse facts and the reported data should be used. Furthermore, the data supplied was substantially complete, and to the extent that any FOP data is missing, it can be filled in from the data of Jiefeng and Senya.

With respect to the first point, Jiefeng and Senya have made their best efforts to obtain the necessary information from its unaffiliated toller and has obtained, notwithstanding the objection and comparative non-cooperation of the unaffiliated toller, if not all, at least the majority of the necessary information. Such efforts were documented in Exhibit 2SD-7 to Senya's response of April 28, 2025 (C.R. 37). Department and judicial practice on this point is clear. A party can only supply information in its possession and to the extent that the information is held by an unaffiliated party, the respondent cannot be found not to have cooperated.

The Court of International Trade has held that Commerce must consider the

evidence showing why the efforts for cooperation failed and whether the respondent had the practical ability to force cooperation. *Venus Wire Industries Pvt. Ltd. v United States*, 417 F.Supp.3d 1289 (Ct. Int'l Trade 2020) is instructive. In *Venus* the issue was whether the e-mails from Venus to its unrelated suppliers served as a sufficiently strong inducement to cooperate. In rejecting the application of AFA, the Court stated in relevant part:

> For its conclusion that Venus failed to act to the best of its ability to obtain its unaffiliated suppliers' cost information, Commerce relied on its subsidiary finding that Venus's emails to its suppliers "did not serve as a strong inducement to cooperate." However, Commerce's reliance on Mueller's observation that the existence of a buyer-seller relationship means that an exporter could potentially refuse to do business with its supplier to induce cooperation placed undue emphasis on Venus's warnings to its suppliers, thereby truncating the Mueller analysis and leading the agency to disregard relevant record evidence. Thus, as discussed below, Commerce's determination is unsupported by substantial evidence and not in accordance with the law.
>
> To begin with, Commerce created an arbitrary linguistic line when it measured Venus's degree of cooperation based on Venus's use of a certain word in its emails to unaffiliated suppliers. While Commerce clearly permits some equivocation by a respondent in its attempts to induce cooperation, the agency has not provided any explanation supporting the distinction it seeks to draw in this case.
>
> Further, while Mueller recognizes that an unwillingness to export goods produced by an uncooperative supplier "would potentially induce {the supplier} to cooperate," the appellate court also stated that "if the {respondent} has no control over the noncooperating suppliers, a resulting adverse inference is potentially unfair to the {respondent}." The concept of "control," as discussed in Mueller, does not require actual control, but, instead, it requires Commerce to consider record evidence concerning the practical ability of a respondent to induce the supplier's cooperation.
>
> Here, Commerce did not adequately consider evidence tending to show that Venus's efforts to induce cooperation failed, at least in part, because of circumstances beyond Venus's control; to wit, the suppliers' own concerns that providing the cost information did not serve the

> suppliers' respective interests. Moreover, Commerce failed to point to any evidence indicating that Venus could induce its unaffiliated suppliers' cooperation. Instead, Commerce appeared to assume that Venus had leverage over its unaffiliated suppliers and simply failed to properly apply it. Commerce's reasoning is inconsistent with Mueller, which recognizes the possibility of inducing cooperation, but not the certainty.
>
> *Venus Wire Industries Pvt. Ltd. v United States*, 417 F.Supp.3d 1289 (Ct. Int'l Trade 2020) at 1307-1308.

Senya's factual situation closely parallels that in Venus. Senya, just like Venus, tried to obtain the information from the unrelated third-parties, but was unable to receive all of the information requested by the Department. Senya did obtain a substantial amount of information from the toller, but could not obtain the final reconciliation information from the toller as such information was deemed as ultra-sensitive by the toller. See Exhibits 2SD-1 to 2SD-6 of Senya's April 28, 2026 response. (C.R. 37) and Exhibits SD-7 to SD-13 of Senya's March 3, 2025 response. (C.R. 93). Such omitted information, however, had no impact on the calculation of the rate as all of the information that related to the factors of product was provided, and the most important information (the purchase of the logs) was directly tied to the business records of the Senya, the respondent, not the toller.

Critically, there is no evidence that Senya had any leverage over its unaffiliated toller to induce cooperation. This is an important factor considered by Commerce and the Couts. *Nippon Steel* at 1383. Notwithstanding this lack of leverage, Senya obtained from the toller all of the necessary information, along with a confirmation from the toller that it did not use certain inputs and the like. In fact, the toller provided substantial information to Senya, who in turn provided it to the DOC, including confirmation as to the usage of labor, electricity, water, and raw materials (with a confirmation that no other raw materials were used) and such information was incorporated into the FOP details.

Specifically, Senya provided the tolling agreement which showed the toller processed the wood logs (poplar log and eucalyptus log) into wood veneer. (See the toller agreement provided in Exhibit SD-8 to Senya's response to the supplemental questionnaire (C.R. 93), the toller's electricity data provided in Exhibit SD-71 (C.R. 92) and the toller's labor data provided in Exhibit SD-76. (C.R. 92) These facts demonstrated that the Toller (and thus Senya) processed the wood logs (poplar log and eucalyptus log) into wood veneer and provided all of the factors of production for these operations. Moreover, Senya Board also reported its wood logs purchased documents and consumption documents in Exhibit SD-32 to Exhibit SD-38. (C.R. 92). In its accounting records, Senya Board recorded the wood log as raw material not wood veneer. Based on the actual purchase and consumption by Senya, it was wood logs rather than the wood veneer that formed the basis for the factors of production. Therefore, Senya reported the raw materials as wood logs. In order to cooperate with the DOC, Senya Board also contacted the toller. The toller provided processing data which was supplied to the Department in Exhibit 2SD-1. (C.R. 37) The toller also provided in Sample inventory documents in Exhibit 2SD-2 (C.R. 37), sample Electricity invoices which includes the rotary cutting section in Exhibit 2SD-3 (C.R. 37), sample labor attendance documents in Exhibit 2SD-4 (C.R. 37), wood log inventory report of Senya Board in Exhibit 2SD-5 (C.R. 37), financial records for the wood logs of Senya Board in Exhibit 2SD-6 (C.R. 37) and the email which shows the process of Senya requesting documents from the toller in Exhibit 2SD-7 (C.R. 37). The wood logs inventory report such as beginning balance, purchase, consumption and ending balance reconcile the financial records of Senya Board.

This was not the only data. Specifically, in Exhibits D-8 and D-9 to its Section D response, Senya reported the standard consumption as provided to it by the toller. (C.R. 161). In Exhibits D-8 and Exhibit D-9, Senya Board used the data which was the toller's standard consumption. For example, the toller told Senya Board the

amount of time worked by a single worker and how many cubic meters of wood log could be processed each day. The toller also reported the hourly consumption of electricity. Furthermore, as detailed in the supplemental Questionnaire, the toller provided the actual consumption in Exhibit SD-71 and Exhibit SD-76. (C.R. 92). The toller listed the factory's energy data and labor data, the total wood log consumption quantity and processed quantity for Senya Board. Then the toller allocated Senya Board's energy and labor data based on the processed quantity. Critically, the data in SD-71 and SD-76 is the actual data of the toller, and includes within this data, the data for the tolling provided to Senya/Jiefeng. This data is close, and only slightly differs from the standard consumption data because it reflects the different, and more exacting, data requested by the Department. Plaintiffs submit that such data was full and complete.

To the extent that the unaffiliated toller did not provide all of the data, the Department can substitute the other data of the respondent to fill-in any gaps when selecting non-adverse facts. See *Shanghai Tainai Bearing Co., Ltd. v. United States,* 658 F.Supp.3d 1269 (Ct. Int'l Trade 2023). For example, the Department could have used the greater of the standard or actual consumption provided by Senya to the Department.

In sum, Jiefeng/Senya fully cooperated and provided all of the information in its possession including all of the information that it was able to obtain from its unaffiliated toller. It provided all of the necessary information to value the poplar and eucalyptus log inputs and the processing of such logs.

## V. <u>CONCLUSION</u>

The facts in this case establish that:

- The use of veneer as a substitute for logs is not appropriate. Veneer is a more advanced product and using it as a surrogate for logs results in an overstatement of costs.

- The Department has of record multiple viable financial statements. The Department erred when it selected a single financial statement for the basis of surrogate financial ratios. The selected financial statement was flawed and the Department had other financial statements of record that were not flawed.
- The Department should not have found that Senya was not cooperative and should not have taken adverse inferences. Senya fully and completely cooperated with the Department and provided all of the information in its possession.

The Court should remand this matter to the Department to correct these errors.

Respectfully submitted,

/s/ David J. Craven

David J. Craven
Counsel to Plaintiffs Longquan Jiefeng Trade Co., Ltd., Zhejiang Senya Board Industry Co., Ltd and Zhangzhou Wanjiamei Industry & Trade Co., Ltd

Craven Trade Law LLC
3744 N Ashland
Chicago, IL 60613
(773) 245-4010
David.craven@tradelaw.com

Date October 13, 2026